Good afternoon. We have this afternoon one case to argue. Johnson et al v. Smith Kline Beecham Corporation et al, numbers 12-2561, 62, 63, 64, and 65. Mr. Spiegel and Ms. Platt. Thank you, Your Honor. Greg Spiegel on behalf of the plaintiffs and appellants. As the court knows, it's the plaintiff's position on this appeal that this case should be remanded to Philadelphia State Courts. The case should be remanded if any of three different entities is a citizen of Pennsylvania. That's Avantor, Smith Kline Beecham Corporation, and GSK LLC slash GSK Holdings. So does it matter whether a company is a holding company or an operating company? The facts that will be considered differ, but the same rule applies. The Hertz versus Friend test should apply to either. There are differences between the two. And that may be right. It's just that Hertz is clearly talking about an operating company. Correct. And are holding companies... Let me ask a factual question here. Does Holdings hold assets for just LLC or other entities plus LLC? I studied that carefully. My understanding is it's only LLC. Although there was a statement in the responsive brief saying that they hold other assets, I think that only means financial assets, that they use the money that they earn from LLC. I'm sorry that I can't tell you 100%, but it's my understanding that LLC is the only entity that Holdings owns. Well, that's an important theoretical point, isn't it, Mr. Spiegel? Because the assertion that you're making to us and that some of the district court judges in the Eastern District have made most prominently Judge Savage in Brewer is that this is an unusual circumstance, right? In other words, some backing off that in Moldano, but how would the theory that's put forth in Brewer apply if this were a circumstance where GSK Holdings were the holding company for multiple LLCs? Would you have to say, okay, now we've got to get in there and figure out which LLC is really the dominant LLC? Well, that would be one approach. But I would think it would be more like we would have to look and see. In a situation like that, Holdings might actually have its own office and have officers who do things on a daily or weekly basis. It does actually have its own office. You're not impressed with it, but it's got its own what a holding company does. It holds. So by the district court and Brewer's lights, you're always going to be looking past that down to the operating company, right? In the case of one member, certainly, and in the case of this particular holding company, where they don't have a permanent office, they rent this 10 by 10 space. It's not the kind of place that the Supreme Court was thinking of in Hertz versus Friend, where officers are located, where they make decisions. This is a place to which directors travel other than the Wilmington Trust employee who works on behalf of so many corporations. This is the first case of which plaintiffs are aware, since Congress added the principal place of business standard, where a court has held that a principal place of business is at a location to which officers or when that corporation could change that location in a second. When they could move it to Pennsylvania, when they could move it to a resort area. Well, nobody's suggested, well maybe you are, but no district court judges accepted the idea that holdings located and chose to be a tax, legitimate commercial reasons for doing what it did, right? Yes, but if I may, we have to distinguish the two parts of the jurisdictional test. That's the incorporation part and the SKB corporation becoming an LLC. We don't challenge that in any way, but there's the separate test, the principal place of business test, and that there is nothing, absolutely nothing, that required them to have their board meetings in Delaware. Delaware law says they can hold them anywhere. If I may for a moment, Mr. Heslop, who was the CFO of GSK PLC, the ultimate parent company, would fly into Philadelphia for meetings. After he got to the airport, he'd drive to Wilmington for the three board meetings that drive back to Philadelphia, stay at the Four Seasons Hotel, and then have more meetings there. Mr. Corrigan was based in Philadelphia. They just went over to Pennsylvania, over to Delaware for these meetings, and nothing in this conversion process, absolutely nothing, requires them to have their board meetings in Delaware. Why wouldn't Ask the Holdings London be its nerve center? Because the activities in London were not on behalf of holdings, and I would like to point that out. On appellate page seven, excuse me, I have the wrong page, appellate page 710, in Mr. Heslop's deposition, at pages 167 and 169, he says, quote, London is very much the strategic home of GlaxoSmithKline PLC, so it is where we determine the strategy, etc. And then he says, and if something needs to come to GlaxoSmithKline Holdings Americas for its approval, we'll send it to them. So the activities in London were taken on behalf of GSK PLC, which, if I may take a minute, owns GSK Holdings, not the defendant in this case, which owns GSK Financial, which owns GSK Holdings America, which owns GSK LLC. So the activities that are being talked about in London are decisions made by Mr. Heslop and his staff on behalf of GSK PLC and all of the entities as to how money will move around. But just picking up on that, Mr. Heslop was the chief financial officer making calls here, and he's in the UK, and Ms. Chilvers Stainer is the treasurer, and she makes the financial decisions with respect to holdings, at least that's what some of the evidence is. Why might it not... We're looking for a nerve center, right, under us, where the brain is, who's making the decisions that others follow. It would seem that it's either Delaware or UK, but I can't find anything that says that it's Pennsylvania. Where are decisions that are telling the rest of the body what to do? How are they emanating from Pennsylvania? If I may back up for a minute on Ms. Chilvers Stainer, she again made decisions for the group in London, and then it was presented to holdings. But that actually does not help the other side. If she's making decisions for the group, and they're carrying through, one could argue that nerve center or the brain, calling the shots here, is in UK. Then they have a problem, because what they are saying is that decisions made by GSK PLC, which are ratified in Delaware, are attributed to holdings for purposes of determining its principal place of business. I don't think... But they still have diversity, right? Well, but they then want to say, but you can't look at activities by LLC to which we delegated our management authority. You can't look at those. But you can look at decisions made on behalf of PLC, which are then brought to us for ratification. Actually, I don't think that's their argument. Their argument is it's in Delaware. Now, the question that's being put to you is, if not Delaware, is it London, a more likely place? But their position is, it is Delaware, that they're not merely ratifying. There's testimony from Mr. Heslip, which the district court accepted, that the decisions are actually made in the board meetings, however short they are. They review the documents together, the three of them gather, they make the decisions, and those are the decisions which govern the investment trajectory of holdings. And that's the business of holdings. So, and it is conducted entirely in Delaware. What is wrong with the district court choosing to accept Mr. Heslip's and other testimony in that regard and saying, that's enough? There's two response to that, if I may first. As this court knows, three other judges in the eastern district have come to a very different conclusion. So if this court were to say, we're going to affirm the district court's decision in this case because we're deferring to the fact finding, that would have no binding effect on the other three judges who looked at the very same evidence and came to a very different conclusion. You're right, that's why the case was expedited. But the question here is, in this case, this is a finding of fact, is it not? I don't believe so. I believe it is the court looking at the historical and chronological facts and saying, I see this as decision making. The other judges looked at the same things. Judge Savage, for example, said, we're just rubber stamping. Yeah, they come to different conclusions. But finding where an entity has its principal place of business, at this point, the law sets out the criteria in Hertz. Why isn't this a finding of fact? Because the court, we believe, is making legal conclusions from historical facts and is incorrectly doing it. You've got to come back and tell me what you mean by that. Well, for example, in the case of a site, this court has distinguished and said, we have to give deference to findings of fact as to chronological events and historical events. But the conclusions from those events, we don't have to defer to. And in this case, if the court were to say that Judge Diamond's findings were findings of fact, then we have findings of fact 180 degrees from those findings of fact by Judge Slomski, Judge Jones, and Judge Savage. Well, you have a conclusion about whether the character of those facts is sufficient to warrant a conclusion that that's the principal place of business. But as to the facts such as, look, they meet, they discuss, they actually make substantive decisions in Wilmington, those are findings of fact. Those aren't legal conclusions. I'm here, he's here, we're talking about substance. We haven't reached a decision in advance. This isn't a charade. We're actually having a serious conversation. We've reached a historical fact, right? And it's also a matter of historical fact. They did that, but they never, ever have rejected the proposal that came from GSK, PLC, or elsewhere. Mr. Heslop is the CFO. He is on the board, they come over. Judge Savage looked at that and said, the fact is, they're not really- But Mr. Heslop isn't in PAA, right? No, he's in London. Right. He's acting on behalf of PLC, flies over to Philadelphia, drives over to Wilmington, goes back, I see that my time is up. That's all right. Okay, and drives back to Pennsylvania. Again, a decision that they can control their jurisdiction, the principal place of business, by choosing where to hold one or two hours of board meetings a year, is antithetical to congressional purpose in adopting the principal place of business standard. It's antithetical to statements in Hertz versus Friend. Now, hold up. When you say it's antithetical to that, isn't the determination about principal place of business something that is driven by two things here. It's driven by the character of an LLC, which Zambelli, Cardin, other cases indicate is- You looked at a member. Governed by the member, right? That's what Zambelli said, yes. And then by the character of GSK's actual activities. I mean, once you accept that you'll look to GSK, then the only question is, what is GSK actually doing, right? Yes, but I would throw on top of that the Mennon case, which is, let's look at what's really happening if another entity is providing the services. It recurs, right? I mean- But the court said this would be the same result, whether we're under a NERF test or any test, we would come to the same conclusion. Where the activities, you enter into a service agreement, another corporation does your work for you, that is attributed to the defendant. Well, respond then to the other side's argument, if you would, please, Mr. Steele. That turns Zambelli on its head. What you're doing is saying, for holding companies, we're going to ignore the existence of the corporation that is the holding company, and we're going to look to the operating company under it, because that will always be the case, right? We are asking for a ruling on the facts of this case, where a corporation is incorporated in Pennsylvania, SKB Corporation. Yes, but we have to look beyond this case, to what the effects of the rule are that you're suggesting. If holding companies hold, that's what they do, they're essentially passive, and their operating companies under them operate, isn't the argument that you're making, that holding companies will always have their principal place of business determined by their operating subsidiary? In other words, Zambelli upside down. No, Your Honor, we're not. We are saying that when a corporation is incorporated in Pennsylvania, it does its business in Pennsylvania, there is no dispute that SKB Corporation was a Pennsylvania resident. It is then converted to a Delaware LLC without any change in its business of any kind. Immediately, the member sees right back to the very same people, the power to run that corporation. In that situation, yes, we are saying that you look to the activities of that LLC, because nothing has changed. They're saying the only reason that the principal place of business is in Delaware is because we choose to have a board meeting there four times a year. We could have it in our offices in Pennsylvania, but we choose not. I thought we were operating from a baseline understanding that this was not a jurisdictionally manipulative decision. That is, it was not, and even your staunchest advocates on the idea that what's happening here is designed to avoid jurisdiction in the state court of Pennsylvania. It was a business decision legitimate, right? The decision to convert was. Sure, but that decision to hold the board meetings is a very different matter. Do you have evidence? Do you have any evidence in the record that they started holding their meetings in Delaware and did it consistently to undermine your client's desire to be in state court for thalidomide jurisdiction? They provided no evidence at all as to why they would hold their meetings in a temporary office like that. This court stated in Quaker Oaths that in a previous case, Kelly, quote, it is noted how directors could select some resort city for their meeting as easily as the home of the industry and with no practical effect, close quote. Congress added the principal place of business statute, not because every corporation incorporated in a particular state to manipulate jurisdiction, but because that allowed it to be done. But here, this is almost like turning it on the head. The reason you added principal place of business is 1332 is so that out of district folks wouldn't be dragged into a federal district and get homered. Here, if it were Pennsylvania, this is where GSK, a lot of the entities, actually have their operating companies. So it isn't, certainly they're the opposite of their home court, right? Right, and so they wouldn't get homered. So it's just the opposite. The point here is that when you, so you have to look for something else besides manipulation. There is no manipulation here. No, that's untrue. This allows them to have cases that were brought, if this case had been brought against SKB Corporation, and of course it was, that's another issue we may not even get to in the argument, but SKB Corporation could not have removed the case because it's in its home state and it won't get homered. Now, by what they have done, they can go into federal court, even though this whole case will be about the activities of SKB Corporation and its predecessors in its home state, but by doing this, they're able to take this case to federal court. So the act of having the principal place of business in the same state as the place of incorporation increases dramatically the chances of their being able to take cases to federal court because most cases against SKB Corporation or GSK LLC are going to be filed in Pennsylvania. When we get you back up in rebuttal, and the thing to think about is what are the contacts or whatever you want to call it with Pennsylvania and Holdings that would cause you to think that the nerve center for Holdings is PA? Yes, sir. Thank you. Ms. Blatt. Thank you and may it please the court. It is undisputed in this case that both- Could you put your name for the record just for this being taped? Sure. Lisa Blatt and on behalf of the defendants at police. Thank you, ma'am. I'm going to pick up where Judge Jordan, I think, left off that it is undisputed that both Holdings and GSK were formed and exist for legitimate business purposes. Well, can you speak then to your opponent's argument that a rule of the sort that Judge Diamond adopted and that you advocate is an invitation to jurisdictional manipulation of I mean, just so you know, though, there is no dispute and they had an opportunity to take massive discovery and took discovery that there was jurisdictional manipulation in this case. But in terms of going forward, we have three responses to that. And the first one is because conversions and corporate structural relationships have real world business consequences. Businesses as a practical matter don't configure for jurisdictional. And if you change from a shareholders. The second reason is under Hertz, courts can look past jurisdictional manipulation. And so by parity of reason, if you know there's no jurisdictional manipulation, I'm hard pressed to see why the court should look past the bright line rules that have already been set up. And the third reason is the Supreme Court in two cases have already rejected the precise policy arguments the other side is making. In Hertz, the Supreme Court said, we're going to in light of the need for bright line rules, even though the results might be counterintuitive. Hertz also was pretty plain about saying, and of course, this nerve center rule is not to be so easily handled as to say, if you rent a room and have short board meetings, short board meetings, you've got you've got a nerve center, which, and lo and behold, along comes holdings to have a short board meetings in a room. Well, let me get to that because I think that's key to this case. It's not a long comes holdings. Holdings has existed since 1999. And from its inception, it has existed as a pure holding company that does nothing that hold. Does it hold for anybody else other than the LLC? Yeah. The record shows that at one point it held something called Quest. And in 2012, the holding company actually purchased a $3 billion company called Human Genome Services or Sciences. So it's a little bit ironic. It actually has a massive company right now. But at the time and what the district court relied on Judge Steinman is that it actually held various companies throughout its period. But you've got a, since its inception, it has been operating exactly like every other holding company in Delaware. And that's the Macy Declaration, a business professor from Yale, that this is what holding companies do. And that brief quarterly meetings, even annual meetings, are more than consistent with good corporate governance. This is what holding companies do. They have short meetings. And when the assets are constant from quarter to quarter, you don't need two hours to do this. You can have the short meetings to get the business taken care of. If that's true, then are the real decisions being made someplace else? Are the real decisions being made in London? And for at least jurisdictional purposes, people should say, you know what? We know Mr. Heslop. He's a smart guy. He gets on a plane. He knows exactly what they're going to do. He shows up. Mr. Corrigan knows what he's going to do because Mr. Heslop's effectively his boss. And Mr. McBride is collecting, McLean, excuse me, is picking up his check from them like he is from maybe 150 other Wilmington Trust clients. And it's a foregone, it is absolutely a foregone conclusion. There's not a thing that's going to happen in that room that hasn't been decided. The problem with that argument is that there's nothing in the record to support it. And everything in the record belies it and contradicts it. All three, Corrigan, McLean, and Heslop testified in their deposition. And again, there's nothing on the other side despite their opportunity to take massive discovery. And this is, the sites are on page 21 and 7 of our brief. And Judge Diamond cites this on page 28 of his brief. That no decision was made until they got to Delaware at the meeting. And that the board can only act collectively. And that no one director can make a decision. And that no one director was pressured by another director. Let me give you an example going back to the days when I was in private practice. I would be representing a foreign company. And they would come in, in this case from Japan. And they'd come in the day before and then meet with my tax partner going over various tax issues. And then they would go over various corporate issues with me. And then we'd go to the meeting and talk about them and make some decisions. And then go to the board meeting. And they would still have a significant discussion. The meetings usually took over an hour. There you could say, okay, they're actually making some hard and fast decisions. But when you get into a room with a person like McClam, who's basically there to say yes, for a 15 minute meeting, because it can't be any shorter, the optics aren't good. Well, let me talk about the optics and poor Mr. McNam, whose reputation is being maligned. I mean, his, it's actually. Probably a good Delawarean. No, it's a bad fact for the other side that McClam does this for other holding companies. This is how holding companies operate. He testified he has a fiduciary duty and he relies on his accounting degree and his CPA in reviewing financial statements. And he has to call the guy from London, George Brown, to go over the financial statements. But however you slice it, if you want to go down this director by director approach, you're walking away from exactly the type of bright line, easy administrability, and clear and predictable jurisdictional rules that you've got to have. And if you do go director by director. If you want to do simple, you go with Hertz and says officers. It doesn't say. Well, the officers here, and again, like all holding companies, which is the Macy Declaration, the officers have no discretion. They can only act on behalf of the board. And if you look at the Brewer opinion, the judge in that case, the district court in that case, on its face says that the board is solely, only the board is responsible for making and controlling the investment decisions. And that's all holding does. It invests, it owns assets. It doesn't do Again, and I think McClam proves it, that other holding companies operate the same way. It shouldn't be that surprising. If that is the case, and that the principal place of business is as easily decided then, as where will we meet, does that create a problem that we should be concerned with? That's what Mr. Spiegel's saying to us is that we're not saying that they set up the holding company to be manipulative. But now that it's set up, if you hold the way the defendants are suggesting you should, they can change their principal place of business every three, four months if the mood strikes them. Now we're going to meet, now we're citizens of Montana. Now we're citizens of Mississippi. Okay. So we know in this case that everything has operated since the same for 2001. Yeah. Okay. But in the next case? Yeah. We got to think past this case. Then there's an argument on the table I want to agree with you that just invites people to mess with the jurisdiction of the federal courts. Well, if you manipulate jurisdiction, the Supreme Court has said courts can look beyond it. And so if you had, I'm having a hard time seeing though how a board is going to fly around the country at different meetings in a way to effectively avoid jurisdiction in light of every tort case that comes up in the system. Holding companies exist. I mean, that's what existed under the Nerve Center test, both before and after Hertz. Hertz cited the top case of the First Circuit, which was a holding company case. The Taver partner case. These are holding companies have been around for a long time. These aren't some new invention in 2009. I'm quite familiar with that. Well, Sears is a holding company. And if Sears starts the holding company meeting, start flipping around, but that hasn't happened. Then that kind of cut against you a little bit, Ms. Blatt, because if the Supreme Court was fully aware of how these things worked, what are we to make of its comment that, yeah, but we don't mean a rented room and a computer. You certainly don't mean a rented room and a computer if you have Hertz Rent-A-Car. But Holdings is not a rent-a-car company. I mean, it just wasn't, I think the simple answer wasn't a holding company. If it was a holding company, I'm not sure what else the Supreme Court could look to. They would, I mean, we can't, and I think we should get to this because this is the issue that has divided the circuits on whether you can take the pharmaceutical operations of the LLC and attribute them to the holding company. Well, what you could do is what Judge Ambrose just referred to. You could have a record of meetings that are longer than 15 minutes. You could have a record of consultation with people in that location that showed I'm getting and taking advice from professionals in this year. You say, what could we look to, things like that. Well, what a nightmare for a jurisdictional rule, and you're going to ask where the director did his vacation, and maybe he looked at, prepared for a board meeting at his vacation house, and you're going to have to get his travel schedule, and you're going to have to subpoena all his driving records, I guess, to see how much he traveled and where he flew. What Hertz, I think, wanted was something bright line, and when you have an undisputed record of the three facts here, that the board can only act collectively, and that it has collectively all times in quarterly meetings that have taken place exclusively in Delaware, and that this is typical of the way holding companies operate. You have no funny business in this case. You have a consistent operation since 2001 that hasn't been done for any jurisdictional. What happened, what is the problem for the other side, is the 2009 conversion of the SKB Corporation, when it's wholly owned subsidiary, in order to perform, solely for the purposes of forming a joint venture with Pfizer for AIDS treatments, to form a company called Veve, converted to the LLC, and that's when it created this collateral jurisdictional consequence of making what had been a Pennsylvania corporation into a Delaware LLC, and under two bright line rules, you have what we have here, which is under Zambelli, the citizenship of the LLC was determined solely by the sole member, the Holdings Company, and then you have the Nerf Center. In other words, Holdings would have had its Nerf Center in Delaware before the conversion. It's just that it used to be SKB was a Pennsylvania corporation. Well, I'm not sure I followed your initial comment there about you'd have to know people's driving records. What I was trying to get at, and what I'm hoping to get you to respond to is, would you concede you'd have a better record here if you had a record of meetings that were longer than 15 minutes? If you had a record here that indicated that there was some permanent presence? Yeah. Well, only, no, because if there was massive things that had happened, but what you have from the record, from Heslop, and what you have from the Macy Declaration, it's just not a whole lot happened. And the three things that were identified that could happen is payment of dividends, approving restructuring, or just making strategic advice. And you obviously had a huge strategic decision recently. Is there a place where the amount of activity in Delaware would become sufficiently small that you'd say, even for a holding company, that's too little? The Macy Declaration says annual meetings are within the norm, short annual meetings, because you're basically, unless, I agree, if you had massive activity, then we'd be wondering, where's this activity happening? But if the assets are constant from year to year, and from, I don't know what it is that they're supposed to be doing. The holding company, and this is repeated throughout the Macy Declaration, it does nothing. It holds. It owns. And to own, I mean, I own stuff too. I don't need to move around a lot to own it. So they're meaning to- It does investments as well, right? Excuse me? It does investments, right? It holds investments, and it facilitates intercompany loans and things like that, and it had cash. If, for some reason, we were to decide that the nerve center or brain of holdings is the UK, obviously you still have diversity jurisdiction. What are the consequences otherwise, if we were to so hold? So I do think that it's right. If you were going to go director by director and relative influence, you would end up in London. I just think jurisprudentially, it's not the greatest outcome for you in terms of guidance for district courts, because- What does it mean commercially for people who are counting on a principal place of business in a certain location? That's why I don't think jurisprudentially it's that wise, because you're basing it on the facts and a relative influence of a board member. Well, you said too good for us. I appreciate your solicitude for us, but think about the business community. Tell us what does it mean for the business community. I think a business community, which embraced Hertz, was that it's a simple test where the actual control occurs. And again, the record is undisputed that they could only act collectively. No single director can make any choice. No single director made any decision until the meetings occurred. And what do you say to the folks on the other side there who say, hey, there are three district judges who viewed these facts differently, and that should affect your standard of review, Third Circuit? Yeah, well, I do think it's a question of law on whether, and there was a legal error made in Brewer and Maldonado and Patton that said, you can look past, you can actually kind of twist Zambelli and meld all these companies together and say the LLC's operations should be viewed as operating the parent or the member. But that's just a legal error. In terms of historical facts- By virtue of ignoring separateness, is that what you mean? Yeah, for two reasons. One, it flips Zambelli, and two, under Hertz, you can only look at the actual nerve center of the entity at issue and not related entities, because it would basically pierce the corporate veil, and they have it alleged veil-piercing. The concern is that if we write an opinion your way and come down, say, Delaware, do you just look at the board of directors where the board of directors meetings are located? Well, not for an operating company, obviously. No, no, I'm talking about- For a holding company, I think, unless there's evidence in the record that the direction, control, and coordination is, if it's done by something other than the board, then you would look at whoever is doing that direction, coordination, and control, and the test is actual under the Supreme Court. So, you have to look at actual control, coordination. No, but I'm saying, do you always look at where the board of directors meetings take place? I think the Macy Declaration- The question is, if this goes up to the Supreme Court, this kind of issue, with regard to holding companies- Yes. You're going to have a tough time making that argument before the court. Oh, no, I have no doubt the Supreme Court would see this as, let's go with bright line rules. That's what we wanted in Hertz, and this is an easy case. It's a very easy case because the record is so clean and crisp on where the actual control occurs in Wilmington. The Macy Declaration said, typically, holding companies are done by the board. All I'm saying is that they were done by someone else, and that someone else was doing something other than at board meetings, and you would look at that. Okay, you're telling me this is an easy case. Now, what supports that conclusion? Because you've got two bright line rules and- You've got a bright line rule that says, do you look to where the brain of the entity or the nerve center is, one that makes the decisions, and one could make an argument that that's the UK. You look to officers. You don't look to 10 by 10 rooms and having short board meetings. Okay, but every holding company has a 10 by 10 room, so you're basically saying holding companies have to get a warehouse to have a board meeting. What are they going to do in this 10 by 10 room? You're missing my point. Okay, a holding company does not need more than a 10 by 10 room, is my point. And to say that they have to do something else besides own a room, they don't need a big room to hold. The argument could be that Mr. Heslop or his successor now in London is making the decisions, and the argument could be made pretty persuasively that the lady who, the woman who does the financial work, Chilton or- I thought it was George Brown, but let me, here's- Is making those decisions in London. Okay. Or George Brown. The only problem with that is the record says something different. But yes, a finding that it's in London is preferable than a finding that's in Pennsylvania. Let me ask you this. Do you think that ever is a decision made by this board that would go against what London wants? Ever? Well, if they definitely take strategic advice from London, I don't know. He's got a fiduciary duty. If it's a violation of their fiduciary duty, I hope not. They can get sued. But all they do is hold, right? I mean- Yeah, so I guess if they- I'm trying to understand this. I think if the financial statement had some grotesque fraud on it and London said overlook it- You mentioned there's a $12 billion investment. Now, there's a lot that goes into a $12 billion investment. Three billion. Three billion dollar investment, I'll pay. Maybe not as much goes into that, but still a lot. Some change. I think that they take direction from London. $1 billion there, pretty soon it adds up. But the record is that there's an independent fiduciary duty that all board of directors have to follow. And your central point about the record is there's nothing to undercut the testimony of each of these directors that they were making real decisions, substantive decisions, about the direction of holdings at their board meetings. These were not preordained. No, and the record is unequivocal that all three of them testified. They exercise independent judgment only at the meetings, and they can only act collectively, and everything happened in Delaware. And yes, that they review financial statements. And if they had restructurings or dividends, they would look at that. But not a whole lot happened. And that's why you say this is the clean case, because you've got that record, right? Yes, without contradiction. And there's nothing that said, I mean, we'd have to just make up the testimony that said Heslop said, well, I forced everyone to do what they wanted because I was from London. Before you sit down, just ask me one final question, just to make the record clear on this. If, for some reason, we were to hold that the nerve center is UK, while you win in this case, we would affirm on 1332 grounds Judge Diamond's opinion or decision, what are the other consequences to these companies? Are there tax consequences or what? Well, it would certainly have jurisdictional consequences. And I guess we'd have to look at what it is to be stateless as a corporation or a foreign corporation. But I don't think that you're saying, you're not ordering them to fold as a holding company. So I don't know outside of jurisdiction. If I could just make one more point before I sit down on the SKB Corporation. My friend on the other side said, what this case is about is SKB Corporation, which is just somewhat mystifying because the complaint says it's all about SmithKline French. I mean, SKB was just a name on the road to today. And so the real party in interest is the only one with the assets and who would have to pay a judgment, which is the LLC. Thank you very much. Thank you. Mr. Spiegel. Thank you, Your Honor. If I may just take a minute on the jurisdictional manipulation, the argument I heard from the other side is not what we are talking about. The Supreme Court in adopting Hertz, the Congress in adding the principal place of business rule, we're not saying, let's look and see if in a particular case there was manipulation. They were setting up rules that would help avoid the manipulation. If this Court were to hold that a holding company along the lines of this one that just holds can establish its principal place of business just by holding board meetings for an hour, two hours a year, that is going to give holding companies like this the incentive to incorporate in Delaware and have their board meetings in Delaware because that is going to increase their chance of having federal jurisdiction. Do you really think that businesses are saying, you know what, don't worry about those tax consequences. Don't worry about facilitating intra-corporate transfers of funds. Don't worry about the other substantive business reasons why a holding company might be a worthwhile thing. I want to make sure I got federal jurisdiction out there. Let's go with a holding company. I mean, that actually seems to play directly in the face of the holding in Brewer that this was not about jurisdiction and that this was about tax and business reasons and that there are thousands, tens of thousands of businesses that are making these judgments. You're honestly telling us that it's for jurisdictional purposes? I'm sorry. I obviously didn't make myself clear. I am not saying this would lead any corporation to change its corporate structure, but I am saying that for any holding company, any existing holding company where you say a holding company like this, its principal place of business is where it holds its meetings. For them, I am not. I am sorry for it coming across otherwise. I am not implying that corporations are going to change from an operating company and then get a holding company to hold them and do all that. I am not suggesting that, John. But I am saying that for holding companies like this, and they were saying time and again in their briefs and relying on Mr. Macy, that there are holding companies like this, there are scads of them. And every holding company like that existing as a holding company will know that if it just holds its board meetings in Delaware, that's its principal place of business. But that's a consequence. I guess the question I'm asking is are we having a horse and cart problem here? What you're saying is somebody could get a jurisdictional benefit of it, but having a jurisdictional benefit is not the same as being manipulative, right? If they're making the decision to operate their company, to put their operating company as an LLC under a passive holding company, if they make that judgment for business reason, and one of the consequences of that is that perhaps they get a jurisdictional route into federal court, is that the sort of manipulation that is problematic, that it flies in the face, as you put it, of Congress's intent? The manipulation is where the board meeting is held, not the incorporation, not the conversion. I'm not suggesting that any company would do that, but I am suggesting, as the Supreme Court has looked at, and as Congress has looked at- Isn't the reason that holding companies are formed and they form in particular jurisdictions is for tax reasons? In terms of incorporating there? I'm sure it is. I mean, that seems to be the reason. It has nothing to do with jurisdictional manipulation. What you seem to be arguing is that it's somehow a piece of bad faith for holdings not to holding company meetings in Pennsylvania, because that's where their operating company is, and if they were really operating in good faith, they would go where their operating company is to hold their holding company meetings, and I guess I'm wondering where you get some authority for that, if I've understood you right. What I am suggesting is this. I have heard nothing. I've seen nothing in the briefs from the defendants. I heard nothing in oral argument today as to any reason for holding the board meetings in Delaware. Because it's a Delaware-based holding company. But for today's purposes, you've got to show that the nerve center slash brain is in Pennsylvania, and you were going to get the last word today on what are the Pennsylvania contacts that makes you have that argument? Your Honor, I will be frank. If your honors are only going to look at the investment decisions, those don't come from Pennsylvania. I can't say that. It's not in the record. But again, I would like to close with this, and I think it is very important, that if the court is going to look at London, decisions made by GSK, PLC, and then brought to Delaware for ratification, never once have they not ratified it, if the court is going to look at the acts of other entities within the GSK family and say, okay, that's really where the decisions are made for GSK. That's where GSK's business is. GSK's money comes from LLC. And GSK gave LLC the power. It's in the same family. I'm suggesting we can't look only to London and say, well, even though those aren't holdings executives, they're not acting on behalf of holdings, but we're going to look at their acts and say, that's holdings acts. We've got to look at what LLC does, because there are no investment decisions if LLC doesn't make the money as the pharmaceutical company. All right. Thank you. Thank you to both counsel. I would like to ask counsel if you would get together with the clerk and have a transcript made of this oral argument, and just split the cost, if you would, please. Thank you very much. Thank you very much. Take your matter into revise.